IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PAULINE TAPIA, et al.,

    Plaintiffs,

v.               No. CIV 03-25 LFG/WDS

LUNA COMMUNITY COLLEGE,
et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

### Introduction

  THIS MATTER is before the Court on the parties' cross motions for summary judgment. On January 15, 2004, Plaintiff Pauline Tapia ("Tapia") filed a Motion for Partial Summary Judgment, contending that Defendants, as a matter of law, breached their contractual obligations with respect to Tapia's employment with Luna Community College ("LCC").[1] [Doc. No. 34] That motion is fully briefed. On January 30, 2004, Defendants filed a Motion for Summary Judgment, requesting dismissal of Plaintiffs' entire lawsuit. [Doc. No. 40.] Defendants argue that Tapia had no employment contract guaranteeing her reinstatement at the same job or at the same salary with LCC, she is unable to establish a property right in her continued employment with LCC, and that she fails

---

[1]Plaintiff's Motion is somewhat unclear.  In the actual Motion, Tapia asks that the Court find Defendants breached a contractual obligation to her.  In her accompanying brief, she asks the Court to determine, as a matter of law, the entire liability issue (including the existence of a contract and breach) in her favor and to try the case to a jury on issues of damages.  [Doc. No. 35.]  In her reply brief, she states that "[d]amage and good faith should be left to the jury."  [Doc. No. 46.]  The Court views Plaintiff's Motion for Partial Summary Judgment as a cross-motion on essentially the same issues raised in Defendants' Motion for Summary Judgment.

to establish a constitutionally guaranteed liberty interest in one's reputation.[2]  That motion is also fully briefed.

After careful consideration of the pertinent law, pleadings and attachments, and argument by counsel, the Court determines that Plaintiff's Motion for Partial Summary Judgment should be denied and that Defendants' Motion for Summary Judgment should be granted.  Thus, the case will be dismissed, with prejudice.  The Court's reasoning is set out below.

## Background

On December 19, 2002, Plaintiffs (Pauline and James Tapia[3]) filed their Complaint for Constructive Discharge, Violation of Civil Rights, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Civil Conspiracy [Doc. No. 1, Ex. A] in state court.  On January 7, 2003, Defendants removed the case to federal court on the basis of Plaintiffs' § 1983 civil rights and due process claims.  [Doc. No. 1.]  Plaintiffs sued Defendant Luna Community College ("LCC"), which is a public educational institution with its main campus located in Las Vegas, New Mexico.  They also sued the LCC Board of Directors, individual members of that Board, the President of LCC, Leroy Sanchez ("Sanchez"), and the Director of LCC's Human Resources, Rita J. Garcia ("Garcia").

Ms. Tapia's allegations concern, in part, her long-term employment at LCC, her request for a six-month leave without pay ("LWOP") in May 2002, LCC's approval of that request, Tapia's later request for reinstatement, LCC's notification to Ms. Tapia that her previous position and pay were no longer available but that she could elect to return to other positions at lower pay, and Ms. Tapia's

---

[2]In Plaintiff's response [Doc. No. 49, p. 8] to Defendants' Motion for Summary Judgment, she agreed to withdraw the "reputation claim", and the Court will, therefore, dismiss that claim.

[3]James Tapia's claims are limited to alleged loss of consortium which are not separate claims for damages, but rather are dependent on his wife's claims.  Thus, if her claims fail, so too do his.

refusal to accept any of those positions. She claims that LCC's failure to allow her to return to a comparable position with a comparable salary violated her rights in a number of ways and caused her injuries. She seeks an award of compensatory damages and punitive damages in relation to the §1983 claims.

Defendants filed an earlier Motion for Summary Judgment [Doc. No. 17] prior to the completion of discovery, seeking to dismiss Plaintiffs' entire Complaint. On October 14, 2003, the Court granted and denied in part this first Motion.[4] [Doc. No. 27.] More specifically, the Court dismissed Plaintiff's claim of civil conspiracy, but denied the Motion with respect to the contract and the Due Process claims. [Doc. No. 27, p. 10.] Regarding the constructive discharge claim, the Court permitted Plaintiffs additional time to file an amended complaint setting out the basis for that claim and advised Plaintiffs' that the failure to file the amended pleading would result in dismissal of the constructive discharge claim. [Id.] Based on Plaintiffs' failure to file an amended pleading, the Court dismissed the constructive discharge claim in an Order entered February 2, 2004. [Doc. No. 42.]

Thus, the cross-motions for summary judgment concern the remaining claims of breach of contract, along with the companion claim for breach of an implied covenant of good faith and fair dealing, and the due process claim.

---

[4]Tapia argues that because this Court ruled in its earlier opinion that there appeared to be questions of fact sufficient to defeat Defendants' first request for summary judgment on the contract claim, there would be no reason to change that analysis even after discovery was conducted. [Doc. No. 49, ¶ 7.] Plaintiff's position is odd in view of her own motion for (partial) summary judgment, where she contends there are no questions of fact that a contract existed and that Defendants breached that contract. Moreover, in the first motion for summary judgment, Defendants made only a half-page argument that the contract claim should be dismissed primarily based on Tapia's failure to allege the existence of a written employment contract. Accordingly, under a New Mexico limitations statute, NMSA § 37-1-23(A), Defendants asked for dismissal of the contract claim. [Doc. No. 18, pp. 6-7.] The Court initially rejected Defendants' summary argument with respect to this claim. However, after the conclusion of discovery and extensive argument regarding the express/implied contract claim(s), the Court now reaches a different conclusion based on the applicable law and development of the record.

## Summary Judgment Standard

Summary judgment is not a "disfavored procedural shortcut."  Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).   Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), cert. denied, 537 U.S. 816 (2002).  Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P. 56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of

4

trial from which a rational trier of fact could find for the nonmovant." Mitchell v. City of Moore, Okla., 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

Here, where the parties have filed cross motions for summary judgment, "[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." James Barlow Family Ltd. Partnership v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1988).  In this regard, each party as the nonmovant is given "wide berth to prove a factual controversy exists." Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998) (internal citation omitted).  Therefore, the legal standard remains the same – each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).

**Undisputed Material Facts**

The Court finds the following facts, taken from the cross-motions, to be material and undisputed.  Tapia was employed as an Administrative Secretary at LCC for approximately 22 years. [Tapia. Dep. at 15-16.]  Over the years, she was employed under an annual written contract, that had been renewed on a year-by-year basis.  In May 2002, Tapia requested and was granted a period of six months of leave without pay for personal reasons.  [Doc. No. 34, Ex. 4; Doc. No. 41, Ex. 6.] LCC President Sanchez approved the request for the period of May 13, 2002 through November 13, 2002.  [Id.]

LCC's written policies in its Professional and Support Employees Handbook ("LCC Handbook") regarding LWOP and reinstatement provide the following:

3.09.05.01.  A LWOP is not recommended or granted except with expectation of reinstatement, but reinstatement is not guaranteed. Operating conditions or needs may make reinstatement impractical at the time reinstatement is requested.  Where practical, the Institute will attempt to fill the employee's position with a temporary employee during an extended LWOP, but reserves the right to eliminate the position or fill it with a regular employee.

3.09.05.02.  An employee returning from a LWOP must contact the Personnel Office prior to the expiration of the leave.  An employee who fails to request reinstatement prior to the expiration of leave will be terminated as a resignation.  Every effort will be made to reinstate an employee to the same or equivalent job and rate held at the time of LWOP.

3.09.05.03.  If the employee's previous position is no longer available and he/she is not placed in another similar position within a reasonable period, or if the employee refuses a position offered to him/her, the Institute has no further reinstatement obligation.  The employee is then terminated as a resignation.

In his May 2002 letter to Tapia authorizing the request for LWOP, Sanchez summarized LCC's LWOP written policy.  "LCC does not guarantee your reinstatement and reserves the right to eliminate your position or fill it with another individual.  If your previous position is no longer available and you are not placed in another similar position within a reasonable period, or if you refuse a position which is offered, LCC has no further reinstatement obligations and you will be considered to have voluntarily resigned your employment with LCC."  [Doc. No. 41, Ex. 7; Doc. No. 34, Ex. 4.]

Tapia admitted that she understood in May 2002, that LCC did not guarantee her reinstatement and that LCC reserved the right to eliminate her position and fill it with someone else. [Tapia Dep. at 47-48.]  When Tapia spoke to Sanchez about her request for LWOP, she claims that he told her "life was too short, and that if [she] decided to come back, [she] could come back to

work." [Tapia Dep. at 45.]  According to Tapia, Sanchez told her that she might not be able to come back to the same position, but that he said in general terms that he "would take care of it."  [Tapia Dep. at 45-46.]

At about the time Tapia began her LWOP, Tapia's supervisor determined that she needed a permanent replacement in Tapia's position, that she needed to add other duties to the position, and that she needed the replacement immediately.  [Sanchez Dep. at pp. 14-16; Medina Dep. at 14.]  On May 17, 2002, Defendants then advertised for a new permanent employee to fill the position, and subsequently did fill the position.  [Medina Dep. at 14; Sanchez Dep. at 14-15.]  Tapia's supervisor testified that it would not have been practical in her opinion to hire a temporary employee to fill that position.  [Medina Dep. at 8.]  According to Plaintiff's previous attorney's information, that employee was hired at a salary of about $24,500.  [Doc. No. 39, Ex. T.]

Tapia's annual contract for the pertinent year of 2001-2002 ran from July 1, 2001 and ended on June 30, 2002.  [Doc. No. 41, Ex. 2.]  Her salary as an Administrative Secretary for that year was $37,048.  [Id.]  This salary was higher than the salary of other people in the same position at LCC. [Tapia Dep. at 49.]  In fact, the midpoint for someone in that position was $23,785 and the maximum was $28,542.  [Doc. No. 34, p. 3, ¶ 14.]  Tapia does not allege that Sanchez or anyone at LCC discussed what salary she would be reinstated at after her LWOP, but it was her assumption that she would return at the same salary.  [Tapia Dep. at 50.]

When Tapia's contract expired on June 30, 2002, she was still on leave without pay.  The contract was not renewed, and no evidence was presented by either party that Tapia or LCC communicated with each other over the non-renewal of the contract when the 2002 contract expired. The written policies in LCC's Handbook regarding appointments and employment is found at

3.02.01: "There shall be no commitment expressed or implied to renew the appointment of any employee beyond the expiration date of the appointment."  [Doc. No. 41, Ex. 3.]

On July 29, 2002, Tapia wrote a letter to Garcia, LCC's Human Resources Director, requesting reinstatement.  [Doc. No. 41, Ex. 9.]  In a letter dated that same day, Garcia responded to Tapia's request, informing her that LCC exercised its right in accordance with its policy 3.09.05 to fill her position, effective July 1, 2002.  Garcia also stated that LCC did not currently have a similar position available and therefore, it had no further reinstatement obligations.  However, Garcia noted that it would maintain Tapia's request for reinstatement and that she would be granted preference based on her request for reinstatement and years of service should a position become available. Garcia indicated that in terms of Tapia's pay, if she was rehired she would receive complete credit for her years of service and would be compensated within an appropriate LCC pay range.  [Doc. No. 41, Ex. 10.]  Garcia further informed Tapia that LCC would make "a good faith effort to re-employ [her] in a similar position when a position becomes available."  [Id.]

On August 26, 2002, Tapia's earlier attorney wrote Garcia a letter requesting that LCC make "every effort" to reinstate Tapia, as provided for in LCC's policy 2.09.05.02.  [Doc. No. 41, Ex. 11.] Tapia's counsel suggested that it would be reasonable and within the duty to make "every effort" to reassign the probationary employee in Tapia's former position and to reinstate Tapia to that position. [Id.]  On September 5, 2002, Garcia wrote Tapia in care of her attorney providing three position announcements for jobs at LCC, including part-time institutional effectiveness officer, full-time preschool caregiver aide and part time improving health initiative training coordinator.  [Doc. No. 41, Ex. 13.]  On September 20, 2002, Garcia provided Tapia's attorney with an additional position announcement for assistant bookstore manager although Garcia erroneously referred to the opening

as bookstore manager.  On September 26, 2002, Tapia's attorney wrote to Garcia that Tapia would focus her attention on the position of bookstore manager.  [Doc. No. 41, Ex. 15.]

On October 4, 2002, Garcia wrote to Tapia's attorney informing her that Tapia was being offered the job of Assistant Bookstore Manager, at a salary of $23,137 for a 12-month employment contract.  On October 8, 2002, Tapia rejected the offer because the offer was not an equivalent job in terms of salary.  Tapia did not apply for or accept any of the other positions as described by LCC to her attorney.

Plaintiff's counsel asked Garcia whether Tapia would have been re-hired at her previous salary if the Administrative Secretary position had re-opened before Tapia asked for reinstatement.  Garcia testified that, under that hypothetical, Tapia would have been brought in at the appropriate pay rate within that pay scale, in view of her 20 years of experience.  [Garcia Dep. at 19-20.]  Thus, even under the hypothetical, Tapia would have been re-hired at approximately $27,000.  Sanchez testified that when he became President at LCC, they changed the salary scale and the school's adherence to it.  He explained that when he came in, the previous board was deviating from the salary scale and that Sanchez found the previous salary discrepancies were unfair to employees.  [Sanchez Dep. at 38-39.]

The preface in LCC's Handbook provides that:  "All statements contained in the Professional and Support Staff Employees Handbook are intended to reflect general policies, procedures, and practices and do not represent contractual commitments on the part of the Institute nor do they grant a right to any employee to be continued as an employee at [LCC].  [Doc. No. 41, Ex. 18.]

**Analysis**

As stated previously, the remaining claims to be decided on the cross-motions for summary judgment are Plaintiffs allegations of breach of implied/express contract and violation of Plaintiff's due process rights based on her assertion that she held a property right in connection to being returned to a similar position with a similar rate of pay after her LWOP.  While Tapia asserts these claims separately in her Complaint, her briefing tends to merge the two claims into one.  Indeed, in her response to Defendants' Motion for Summary Judgment, she mentions her due process rights in only one passing reference, e.g., "[t]his is, incidentally, probative of Plaintiff's due process claim that she had no notice of Defendant's decision to require her to forgo the exception upon reinstatement[5]." [Doc. No. 49, pp. 4-5.]  Similarly, in her brief in support of her summary judgment motion, Tapia primarily presents argument regarding the contract claim and then only briefly argues that she was entitled to some kind of unknown procedural due process regarding notice of changes to salary ranges.  [Doc. No. 35, p. 9.]

Although the Court discusses the claims separately, in a sense it appears that both of Tapia's claim arise from the argument that an implied contract arose between her and LCC regarding reinstatement to a similar position with a similar rate of pay.

## I.    **DUE PROCESS CLAIM**

In determining whether a governmental or public agency has deprived an individual of her due process rights, the Court engages in a two-pronged inquiry:  (1) did the individual have a protected interest giving rise to due process protection; and if so, (2) did the government afford the individual with the appropriate level of process.  <u>Garcia v. City of Albuquerque</u>, 232 F.3d 760, 769 (10th

---

[5]It is unclear to which "exception" Plaintiff refers.

Cir.2000).  If the Court determines that the Due Process Clause applies based on the existence of a protected property interest, the question that remains is what process was due.  Id. (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)).

Property interests are not created by the Constitution.  They are created and defined by existing rules or understandings that stem from an independent source such as state law or federal law.  Loudermill, 470 U.S. at 538.  Independent sources also may include an express or implied contract, a written contract with tenure provisions, or a contract implied from policies and practices of a particular institution.  Calhoun v. Gaines, 982 F.2d 1470, 1473-74 (10th Cir. 1992).

The "standard for the existence of a property right in employment is whether the plaintiff has a legitimate expectation of continued employment."  Garcia, 232 F.3d at 769 (citing Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998)).  To have a property interest, the individual clearly must have more than an abstract need or desire for it and more than a unilateral expectation of it.  Id.  It has generally been held that a public employee has a property right protected by the Fourteenth Amendment when that person's employment can be terminated only for specific reasons.  West v. Grand County, 967 F.2d 362, 366 (10th Cir. 1992).  In other words, a contract that promises continued employment except for "just cause" can create a property interest in continued employment.  Kingsford v. Salt Lake City School Dist., 247 F.3d 1123, 1129-30 (10th Cir. 2001)

The Court first looks to state law in order to ascertain whether a property interest actually exists.  Bishop v. Wood, 426 U.S. 341 (1976), overruled on other grounds by, Loudermill, 470 U.S. 341.  In Lovato v. City of Albuquerque, the New Mexico Supreme Court noted that it "has been recognized that under New Mexico law a constitutionally protected property right can arise despite the absence of a statute or formal contract.  106 N.M. 287, 290 (1987).  Lovato arose from an

employment dispute, wherein the Court found that the plaintiff's continued employment in the same position rose to the level of a constitutionally protected property interest.  Id.  An express or implied right to continued employment could provide the basis for an employee's reasonable expectation of continued employment.  Id. at 289-90.[6]

Here, the question is not whether Tapia had a generally protected property interest with respect to her continued employment with LCC.  If she had been terminated or released from her position **during** her one-year contract, depending on the circumstances of her termination, she would have had a strong argument that she had a reasonable expectation of continued employment.  This is true because her express one-year employment contract explicitly provides that she can only be terminated during the contract period for a variety of good cause reasons, e.g., unsatisfactory work performance, incompetency, and insubordination.  [Doc. No. 41, Ex. 2, ¶ I.]

However, that is not the question here.  Under the circumstances of this case, Tapia's one-year contract expired at the end of June 2002, and the contract was not renewed.  Thus, the Court must determine whether Tapia's expectation of continued employment in a similar position with similar pay was reasonable after her one-year contract had expired. In essence, Tapia's argument becomes one sounding in implied contract.  She argues that based on her longevity, the LCC's tradition of renewing one-year contracts, and Tapia's own long history in having her contracts

---

[6]The New Mexico Supreme Court, in Lovato, held that the employee's interest in continued employment was a constitutionally protected property interest requiring the City to grant him a full hearing.  106 N.M. 287. The Court finds Lovato distinguishable.  Lovato was a classified city employee who was considered a permanent employee of the City.  He was assigned to a position over a period of thirteen years that resulted in a five percent salary increase and then removed from that assignment with a corresponding reduction in pay.  Despite his grievance, he was not permitted a hearing.  Under those facts, the district court correctly found that Lovato's employment at the position, grade and pay rate could not be considered temporary such as to defeat application of the merit system and personnel rules.  Here, the facts are easily distinguishable.  Tapia, unlike Lovato, was retained over the years not as a permanent employee but on a year-by-year renewed contract.  She voluntarily left for a LWOP, unlike Lovato who was reassigned by the employer.

renewed, she held a reasonable expectation of continued employment (after her LWOP and the expiration of her contract) in a comparable position and at a comparable rate of pay.

In Snyder v. City of Moab, the Tenth Circuit (applying Utah law) determined that the employee's expiration of her term of employment extinguished whatever property rights she might have had in her employment. Snyder, 354 F.3d 1179, 1191 (10th Cir. 2003). In Farnsworth v. Town of Pinedale, Wyoming, the Tenth Circuit reached a similar result in affirming summary judgment in favor of the employer because the employee's constitutionally protected property right in her continued employment extended only until the end of her term of office. Farnsworth, 968 F.2d 1054, 1058 (10th Cir. 1992.)

In Graff v. Glennen, the New Mexico Supreme Court held that no genuine issue of material fact existed to support judgment in the plaintiff's favor. 106 N.M. 668 (1988). "The unequivocal language in correspondence to [the plaintiff] and in his employment contracts unmistakably represents a year-by-year employment relationship that did not entitled [the plaintiff] to employment with [the defendant] beyond the dates stipulated in the contracts. Id. at 668-69. Even though the plaintiff in Graff had had his contracts renewed for four successive years, his unilateral expectation of continued renewals was insufficient to establish a legitimate entitlement to employment with the defendant. Thus, he did not have a property interest sufficient to require the defendant to afford him a hearing to review his discharge. Id. at 669.

Similar to the results of these cases, the Court here finds that after Tapia's one-year contract expired, any protected property interest she held in her continued employment was extinguished. Her expectation of continued renewals of that contract was unilateral at best. Moreover, several courts have concluded that repeated contract renewals, do not, by themselves, create a reasonable

expectation of permanent employment.  Edinger v. Board of Regents of Morehead State Univ., 906 F.2d 1136, 1141 (6th Cir. 1990); Sabet v. Eastern Virginia Medical Authority, 775 F.2d 1266, 1270 (4th Cir. 1985).  In Doscher v. Seminole Common Consolidated School District No. 1, Gaines Cty., Tex., 377 F. Supp. 1166 (N.D. Tex. 1974), the Court concluded that twenty separate renewals of one-year contracts were insufficient to support a reasonable expectation of permanent employment.

In addition, Plaintiff provides no authority for the proposition that the repeated renewal of her one-year contracts supports a reasonable expectation that she would be reinstated at that particular salary or in that particular job.  *See* Childers v. Independent Sch. Dist. No. 1 of Bryan County, 676 F.2d 1338, 1341 (10th Cir. 1982) (holding that although tenured teachers had a property right in continued employment, they did not have a property interest in a particular assignment because their contract did not provide that teachers must be given the same assignment or wage upon renewal).

Here, Tapia's one-year contract for the year 2001-2002 says nothing about possible renewals for subsequent years, positions or wages.  The contract explicitly provides that her contract period in the position of Administrative Secretary began on July 1, 2001 and ended on June 30, 2002.  Thus, similar to Childers, nothing in Tapia's written one-year contract promises her (or even addresses the possibility) that she would be given the same position or same pay during possible subsequent renewals.  Moreover, she conceded that she knew LCC policy stated she might not be reinstated in the same position, that her job might be filled by another person and that she was advised of these possibilities by Sanchez.  In addition, LCC's express policy regarding renewal of employment is clearly set forth in the LCC Handbook.  "There shall be no commitment expressed or implied to renew the appointment of any employee beyond the expiration date of the appointment."

14

Tapia also argues unconvincingly that her LWOP period that was authorized to extend beyond into November (subsequent to the end of her one-year employment contract) trumped the one-year contract. Tapia provides argument only, without citation to any legal authority to support her position. There simply is no basis to find that the employment contract was subordinate to the authorized LWOP. Nothing in the correspondence between Tapia and LCC indicated that the LWOP might affect the renewal or nonrenewal of her contract, or that it might extend that one-year contract. In addition, nothing in the LWOP policy statements provides support for Tapia's argument. The fact that Tapia voluntarily requested a six-month LWOP and that she was aware at that time that LCC might not return her to the same position further defeats her argument that the LWOP could extend her employment contract. *See* Clark v. New Mexico CYFD, 128 N.M. 18, 25-26 (Ct. App.) (worker who voluntarily resigned from her classified position to accept an exempt position and who subsequently returned to a classified position did not retain the rights and benefits of a classified position; indeed, she lost all the rights and benefits associated with her previous classified position notwithstanding the fourteen years she held in the first classified position), *cert. denied,* 128 N.M. 148 (1999).

There simply is no basis to find that Tapia had a reasonable or legitimate basis to believe she had a protected property right in her continued employment (in a similar position and at a similar rate of pay) after her contract ended. While the expectation of re-employment need not be based on an "iron clad contract," there must be more than a unilateral grasp or hope in obtaining such a property interest. Housley v. North Panola Consol. School Dist., 656 F. Supp. 1087, 1089 (N.D. Miss. 1987). Therefore, the Court concludes that there is no genuine issue of material fact for a jury to decide on

15

this issue because as a matter of law, no fact finder would find Tapia's expectation reasonable after her one-year contract expired.

Even if the Court were to conclude that Tapia had a reasonable expectation of continued employment in a comparable position at a similar pay rate, it is not clear what process Tapia claims was due and yet denied to her. This is not a case where evidence was presented demonstrating that LCC was required to provide some kind of notice to Tapia that her contract was not being renewed. After 22 years, it would seem that Tapia would be aware of the dates of her contract renewal periods and LCC's practice in sending her the paperwork to renew her contracts. *Compare* Calhoun, 982 F.2d at 1472 (written policies of college regarding contract renewal provided that employees were to be notified by a certain date of continued employment). Moreover, Tapia did not come forward identifying what specific notice or type of hearing that LCC policies guaranteed but denied to her.

The Court finds no genuine issue of material fact for a jury to decide with respect to Tapia's alleged constitutionally protected property right or a denial of process to which she might have been entitled. Therefore, the due process claim will be dismissed.

## II.   IMPLIED EMPLOYMENT CONTRACT CLAIM

Tapia contends that there was both an express and implied contract of employment that LCC breached. [Doc. No. 44, p. 1.] While Plaintiff refers to an express contract, her argument actually sounds in implied contract law. It is true that Tapia had an express contract with respect to her annual employment and salary for 2001-2002. But Tapia does not contend that the terms of that written document were breached. Moreover, any such argument would fail because Tapia was not terminated *during* her contract year, and there is no argument that the contract was breached *during* that year with respect to position or wages. Thus, there simply is no viable argument here that LCC

16

breached an express employment contract that limited its ability to terminate the employment relationship with Tapia.  Nothing in that contract restricted LCC's ability to decide not to renew the contract.  As stated previously, LCC's policies expressly provided for the possibility that it might not renew every employee's contract.

Tapia does, however, assert that an implied contract[7] arose between her and LCC and that LCC breached it by not reinstating her after her LWOP to a comparable position at a similar rate of pay.  An implied contract may arise from written representations in an employee handbook, in oral representations, in the conduct of the parties, in the customs and practices of the employer, or in a combination of representations and conduct.  Garcia v. Middle Rio Grande Conservancy District, 121 N.M. 728, 731 (1996); Hartbarger v. Frank Paxton Company, 115 N.M. 665, 669 (1993), *cert. denied*, 510 U.S. 1118 (1994).  The existence of an implied contract often involves a discussion of whether an employee's expectations are reasonable regarding the terms of her employment, and whether promises or offers made by the employer were sufficiently explicit to give rise to the reasonable expectations by the employee.  *See* Hartbarger, 115 N.M. 672 (discussion reasonable expectations regarding the employer's right to terminate employment relationship).

---

[7]An argument might have been made that a plaintiff cannot rely on an implied contract to sue LCC.  LCC is a public educational institution, and New Mexico law provides that governmental entities, like LCC, are granted immunity from actions based on contract, except such actions that are based on a valid written contract.  NMSA § 37-1-23(A).  The Court does not decide this case on that basis.  In Garcia v. Middle Rio Grande Conservancy District, the New Mexico Supreme Court examined an implied contract claim, along with § 37-1-23(A) and determined that the term "valid written contract" incorporated the implied employment contract (at least where premised on a written personnel policy that controlled the employer-employee relationship) such that governmental immunity under § 37-1-23(A) was waived.  Here, Tapia argues that her implied contract arose in part from a comprehensive employee handbook.  Although the Court does not necessarily agree, it will not conclude that LCC is entitled to immunity under § 37-1-23(A), especially where Defendants have not taken that position in their recent Motion for Summary Judgment.

Whether an employee held a reasonable expectation regarding the terms of her employment and whether the employer breached those terms often present jury questions.  However, courts do sometimes decide these questions as a matter of law, at the summary judgment stage, where the plaintiff makes an insufficient showing of the existence of an implied contract or breach.  *See, e.g.,* Stieber v. Journal Publishing Co., 120 N.M. 270 (Ct. App.), *cert. denied* 120 N.M. 68 (1995) (affirming summary judgment for defendant based on findings that statements by newspaper did not amount to a contract and that newspaper did not breach an alleged contract to promote).  Moreover, while Tapia argues that these questions present jury questions, her own motion for partial summary judgment contradicts that position.

### A.   *LWOP Provisions of LCC's Handbook*

First, Tapia argues that the provisions of LCC's handbook regarding LWOP are sufficiently specific to imply a contractual promise by LCC to reinstate Tapia to a similar position at a similar rate of pay.  Tapia states that these (LWOP) sections "comprehensively control[] the employer-employee relationship . . . and [create] a reasonable expectation for . . . employees that [LCC] will follow the provisions of the Personnel Policy."  [Doc. No. 35, p. 6] (*citing* Garcia, 121 N.M. 728).

Plaintiff's argument is unconvincing for a number of reasons.  First, and most importantly, the LWOP provisions expressly state that reinstatement is not guaranteed, and that LCC reserves the right to eliminate the position or fill it with another regular employee.  While the policies provide that LCC will make "every effort to reinstate" the employee to her same or comparable position and pay, nothing in the policies promises that this will occur.  Moreover, Tapia testified that she knew she might not be reinstated to her same position in accordance with these very policies.

18

In addition, while perhaps an implied contract could arise from this section or other sections of LCC's handbook, the preface of its handbook clearly provides disclaimer language stating that its provisions "are intended to reflect general policies, procedures, and practices" rather than "contractual commitments" by LCC.  It is true that disclaimer language is not dispositive as to whether an implied contract might arise, but such language may guide the court's inquiry in making such a determination.  Here, the disclaimer language is clear and unequivocal.

Moreover, Tapia's reliance on Garcia is misplaced.  In Garcia, the defendant's personnel policy contained "provisions relating to most every aspect of an employment relationship, including job description, compensation (including salary on promotion, demotion, or transfer), overtime, compensatory time, time clock violations, tardiness, sick leave and annual leave, and holidays."  121 N.M. at 732.  The policy also included a section applicable to when personnel actions resulted in suspension, termination, or demotion.  Id.  The Court concluded that the personnel policy in that case was so specific that employees could reasonably rely on its provisions and expect the defendant to conform to those provisions as well.  Id.  Here, Tapia makes the argument that LCC's handbook is equally specific and yet she provides no evidence of comparable specificity.  Indeed, as stated previously, the provisions on which Tapia relies *specifically* deny any notion of guaranteed reinstatement.  The fact that the handbook states LCC should make every effort to reinstate the employee is hardly language from which a guarantee could be inferred, especially when viewed with all of the LWOP provisions.

Here, as a matter of law, the Court determines that such language, when viewed in terms of all of the LWOP provisions, the handbook's preface, and Tapia's notice that she might not be reinstated, do not create a genuine issue of fact for a jury to decide.  No reasonable fact finder would

19

read these provisions and conclude that Tapia had a reasonable expectation that she was guaranteed a return to her previous job and rate of pay. The language when viewed as whole, is nothing more than aspirational in tone, nor does the Court find (as Tapia argues) that the LWOP provisions are internally inconsistent with each other.

Tapia also appears to argue that the letters between Tapia and LCC regarding reinstatement were a "stream of correspondence" amounting to a "job offer." The Court is unconvinced. Nothing in the letters infers that Tapia will be reinstated to a similar position at a similar rate of pay. Instead, she is advised of just the opposite in terms of her reinstatement to the same position. Tapia contends that LCC had a "concomitant obligation" to provide "like pay" to her, and yet the Court finds no such promise by LCC.

### B. _Verbal Representations_

In support of her implied contract claim, Tapia also relies on communications made by Sanchez to her when she was approved for the LWOP. For example, Sanchez told Tapia that "life was too short, and that if [she] decided to come back, [she] could come back to work." In addition, Sanchez told her that she might not be able to come back to the same position, but that he said in general terms that he "would take care of it." Tapia admits that Sanchez never discussed the rate of pay at which she might be reinstated, but essentially assumes that she would be reinstated at her same pay. This is not the type of evidence that will support a showing sufficient to demonstrate an implied contract. There is nothing specific about Sanchez's language, nor does it promise Tapia that Sanchez would do anything other than "take care" of getting her back to work, whatever that means. The type of work and the rate of pay are neither specified, nor promised. Tapia's assumptions to the contrary do not amount to evidence.

20

Here, contrary to Tapia's position and the authority she relies on, a reasonable jury could not find that LCC's words and conduct support an objectively reasonable expectation that an implied contract arose promising her reinstatement to an equivalent job and rate of pay.  *Compare* Mealand v. Eastern New Mexico Medical Center, 131 N.M. 65, 70-71 (Ct. App.), *cert. denied*, 131 N.M. 64 (2001) (employer's handbook sets out in great specificity its policy regarding progressive discipline; thus employee had  reasonable expectation that employer would conform to policy, especially where the pivotal provision stated that no employee would be terminated without prior review by Human Resources).  Therefore, the Court concludes that there are no genuine issues of fact sufficient to send the question of the existence of an implied contract to a jury.  Because the Court cannot conclude that genuine issues exist with respect to the existence of an implied contract, it does not reach the question of whether LCC breached an alleged contract.

Accordingly, the Court will dismiss Tapia's contract claim, along with the companion claim of breach of the covenant of good faith and fair dealing.

## Conclusion

For all of the reasons stated above, the Court dismisses Tapia's claims that LCC violated her liberty and due process rights.  The court also dismisses Tapia's claim that an employment contract arose between her and LCC with respect to reinstatement issues, and the related claim of breach of the covenant of good faith and fair dealing.

21

IT IS THEREFORE ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. No. 34] is DENIED, and Defendants' Motion for Summary Judgment is GRANTED, with the result that Plaintiffs' Complaint in its entirety is DISMISSED, with prejudice.


_____

Lorenzo F. Garcia
Chief United States Magistrate Judge